[No. 22846-3-I.   Division One.   January 3, 1990.]

THE STATE OF WASHINGTON, *Appellant,* v. DAVID
LEE WILKINSON, *Respondent.*

*Norm Maleng, Prosecuting Attorney,* and *James
Michael Cline, Deputy,* for appellant.

*Bernadette J. Foley,* for respondent.

WEBSTER, J.—The State appeals an order granting David Lee Wilkinson's motion to suppress. Wilkinson surrendered a controlled substance to a police officer in response to a question during a frisk for weapons. He was a passenger in a car stopped because its driver had a suspended license.

## FACTS

The officer came in contact with Wilkinson on the night of January 23, 1988. Wilkinson was in a car driven by James Blair Jr. Blair admitted a month earlier to the same officer that his license was suspended. The admission came during an investigation by the officer which led to Blair's arrest for possession of stolen property at 2827 Southwest Yancy Street, Seattle, Washington. Between that time and the night of January 23, the officer had several contacts with Blair. On the night of January 23, the officer saw him standing next to a blue compact station wagon at the Yancy Street address. The officer stopped and spoke with Blair and another individual who was inside the car. Blair assured the officer he was not going to drive. The officer drove approximately one block east and parked in a Pay'N Save parking lot to do some paperwork.

About 10 minutes later, the officer observed the blue station wagon drive by. Blair was driving. The officer proceeded behind, actuated his emergency overhead lighting, and shined his spotlight on the car—first at full intensity to get Blair's attention, then at a lower intensity. When the car did not immediately pull over, the officer increased his spotlight to full intensity. Blair proceeded eastbound to the intersection of Delridge Way Southwest and Southwest Andover, turned left, and continued northbound a quarter to a half a block before pulling to the curb. The blocks were extra long. According to the officer, "It wasn't as if they were trying to get away . . . it's just that they weren't pulling over immediately as they should have."

With his spotlight on, the officer could see into the car before it stopped. There were three individuals: Blair driving, Wilkinson beside him in the passenger seat, and, in the back, the person who earlier was sitting inside the car at the Yancy address. The last person "wasn't doing anything" although his head would turn, talk to Blair and Wilkinson, and then look back at the officer. Wilkinson "was moving around considerably, and it appeared as though he was trying to hide something under the seat. He kept leaning forward down near the front of the seat."

The officer exited his car and advised the three over his PA system to make their hands visible by putting them on the dash or seat in front of them. He was concerned for his safety because he was by himself and another patrol unit was not nearby. Also, it was dark, and he remembered arresting the person in the backseat for a controlled substance violation and for possession of stolen property when he arrested Blair. He recalled seeing Wilkinson, too, at the Yancy Street address when he arrested Blair. The officer approached the passenger side of the car and asked Wilkinson to get out, which he did. The officer was concerned that "if [Wilkinson] was attempting to hide a weapon or something, . . . it would be most readily accessible to him". The officer told Wilkinson to put his hands on top of the car and began a patdown search.

Either immediately before or during the patdown, the officer asked, according to Wilkinson,

> I'm not going to get stuck with any sharp objects or syringes or anything like that? And I says: No. And then I reached into my pocket and I says: Well, I do have a syringe in my pocket, and I pulled it out and handed it to him.

The officer asked about sharp objects and syringes because he knew several fellow officers who had frisked suspects and had accidentally been stabbed by hypodermic needles. He was concerned about contracting AIDS or hepatitis. He had inquired about sharp objects and syringes in the past, and was wearing gloves at the time.

The officer examined the syringe with a flashlight. It contained blood, which appeared brownish red. Based on years of experience with controlled substance violations, he knew of a practice whereby drug users inject a syringe into their veins and work the plunger up and down. According to the officer,

> They call it jacking off, and what it does is it brings blood back into the syringe, mixes it with the narcotic, and they just keep doing it back and forth, back and forth. I'm advised, although I have no personal experience in it, that it creates a more intensive high for them.

The officer suspected recent drug use, "probably heroin, something of that nature". He removed the cap and discovered fresh blood on the needle.

At this point, the officer placed Wilkinson under arrest and advised him of his *Miranda* rights. In a search incident to the arrest, the officer discovered another syringe with clear liquid in it and two white tablets, which he confiscated as evidence. Laboratory analysis revealed that the tablets did not contain a controlled substance, although the syringes did.

At the suppression hearing from which the State appeals, Wilkinson, who is 6 feet 5 inches tall, said he was trying to move his seat back for leg room and that he did not notice the police car until after Blair turned the corner. Moments earlier, he testified that Blair said, "Oh, shit, the cops are pulling us over," before turning the corner.

## BASIS FOR PATDOWN

An officer who properly stops a car may conduct a search for weapons within the immediate control of the driver and passengers when one of the persons in the car moves as if to hide a weapon. *State v. Kennedy,* 107 Wn.2d 1, 726 P.2d 445 (1986). This is a "bright–line rule". *State v. Patterson,* 112 Wn.2d 731, 734, 774 P.2d 10 (1989). It is exactly what occurred in Wilkinson's case.

In *Kennedy,* the defendant was convicted of possessing over 40 grams of marijuana. He moved to suppress the discovery of marijuana on the ground that it was obtained as a

result of an illegal stop and search of the car he was driving. Our Supreme Court disagreed. After an introductory paragraph, the court listed in the next two paragraphs the facts which justified the stop. Then the court identified the fact which justified a search for weapons:

> After he signaled Kennedy to pull over, *Adams observed Kennedy lean forward as if to put something under the seat.* Once they both stopped, Adams approached the car and asked Kennedy to get out. Kennedy complied and moved to the rear of his car. Adams looked into the car to identify the passenger and reached under the front seat. A plastic bag was found which he suspected contained marijuana and he removed it from the car.

(Italics ours.) *Kennedy,* at 3. The court's analysis began with the stop.

> If the initial stop was unlawful, the subsequent search and fruits of that search are inadmissible as fruits of the poisonous tree. *Wong Sun v. United States,* 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963); *State v. Larson,* 93 Wn.2d 638, 611 P.2d 771 (1980).

*Kennedy,* at 4. After determining that the stop was lawful and that the officer could require Kennedy to exit the car, the court addressed the search of the area under the driver's seat where Kennedy had been sitting. *Kennedy,* at 9. The court rejected the idea that the marijuana found there was in "plain view" or "open view." Instead, the court applied another exception to the warrant requirement: "The same concern that justifies [a] frisk under . . . Fourth Amendment analysis, *possible danger to the officer,* justifies it under article 1, section 7." (Italics ours.) *Kennedy,* at 10.

> Turning to the facts of the present case, Adams saw a furtive gesture sufficient to give him an objective suspicion that Kennedy was secreting something under the front seat of the car. From his vantage, in his own car behind Kennedy's, he had no way of knowing what Kennedy was hiding. When he had Kennedy outside the car, *he did not frisk him, as he could have had he suspected Kennedy might be armed.* However, there remained the gesture, the unknown object under the front seat, and the passenger inside the car who had easy access to the object.

(Italics ours.) *Kennedy,* at 11. This language assumes the officer had reason to believe Kennedy was armed. Just as Kennedy could have hid a gun under the driver's seat, he could have picked one up from that location and put it on his person. In the course of attempting to hide a gun, he could have changed his mind and kept it on his person. Here, too, the officer had no way of knowing whether Wilkinson picked up a gun from under the seat or whether he had put one there. Wilkinson could have attempted to hide a gun, only to abandon the effort because of the apparent difficulty he was having. If the officer had simply reached under the front seat, he could have been shot in the back.

The suspicion of a marijuana purchase in *Kennedy* did not create a suspicion that the defendant was armed. *See* 3 W. LaFave, *Search and Seizure* § 9.4(a), at 507 & nn.34, 35 (2d ed. 1987). Nor did the court in *Kennedy* suggest otherwise. The court observed that the State's interest in preserving evidence did not factor into its analysis as it would in the case of a search incident to arrest. *Kennedy,* at 11–12. This distinguished *State v. Stroud,* 106 Wn.2d 144, 720 P.2d 436 (1986), which upheld a car search incident to arrest based on the dual interests of officer safety *and* preserving evidence.

The trial court noted the potentially innocent nature of Wilkinson's movement:

> Then we have the defendant who was a passenger, lean forward or move about in the seat, which is, as we now know, as consistent with legal behavior as illegal behavior, which is the adjustment of the seat, dropping a cigarette, spilling a Coke, whatever it might be. We have that—that is the only factor, that and the arguably illegal activity of driving without a valid license, that led to the stop and led to the removal of the passenger, the innocent passenger, who has now done nothing wrong other than move about in a front seat in a manner which is consistent both with legal and illegal activity.
>
> As a result of that activity, which is ambivalent at best, he was removed from the car and his person is searched, and I do not find that that is an acceptable circumstance. That means, if I am driving home tonight and the person that's giving me a ride is known to not have a driver's license and the car is stopped, and by coincidence I move to put the seat back at the

same time it's stopped, that I could have a body search done, and I just don't think that's a legitimate set of circumstances
. . ..

We acknowledge the trial court's concerns, but "'[t]he Constitution does not require an officer to wager his physical safety against the odds that a suspected assailant is actually unarmed.'" *State v. Belieu*, 112 Wn.2d 587, 602 n.3, 773 P.2d 46 (1989) (quoting *State v. Serrano*, 14 Wn. App. 462, 469–70, 544 P.2d 101 (1975)). As stated in *Kennedy*,

The scope of the search should be sufficient to assure the officer's safety. This means that the officer may search for weapons within the investigatee's immediate control. *We also recognize that such a limited search applies to any companion in the car because that person presents a similar danger to the approaching officer.*

(Italics ours.) *Kennedy*, at 12. In the context of an admittedly valid stop, any reasonable basis supporting an inference that the investigatee or a companion is armed will justify a protective search for weapons. "'A founded suspicion is all that is necessary, *some basis from which the court can determine that the detention was not arbitrary or harassing.*'" *Belieu*, at 601–02 (quoting *Wilson v. Porter*, 361 F.2d 412, 415 (9th Cir. 1966)). This protects police officers, who have a right, if not a duty, to investigate violations of law when stops are permissible.

The facts in this case are more compelling than they were in *Kennedy*. The officer here had a clear right to stop the car in which Wilkinson was a passenger. The furtive movement in this case was more prolonged and more pronounced than in *Kennedy*. The stop occurred in the middle of night, not at midday. The officer testified that he actually felt threatened, whereas in *Kennedy*, it does not appear the officer testified. In *Kennedy*, there was no evidence other than a brief forward lean to support a belief that Kennedy was armed. Here, the officer's stated purpose was self–protection, and his fear was well founded. He was confronting three persons, including two individuals he had personally arrested for felonies. A third person, Wilkinson, was present at the arrests, and was significantly larger than

the officer. The driver of the car disregarded the officer's authority, both in driving and in not pulling over immediately. In the darkness, without any apparent witnesses, the scene was set for a possible tragedy. The officer showed restraint. He did not draw his gun in proceeding directly to the person who posed the greatest threat. When he discovered the apparent reason for Wilkinson's furtive movement, *i.e.,* a controlled substance, and this dispelled his fears, he left the others alone. We find nothing improper with the officer's self–protective frisk of Wilkinson.

## QUESTION DURING PATDOWN

We next address the officer's question during the patdown, which, like the frisk, appears to have been for the purpose of self–protection. Wilkinson contends his verbal response to the question and the physical evidence surrendered should have been suppressed because he was not given *Miranda* warnings. We disagree.

■ Ordinary traffic stops, like other investigative stops, do not involve custody for purposes of *Miranda. See Pennsylvania v. Bruder,* 488 U.S. 9, 102 L. Ed. 2d 172, 176–77, 109 S. Ct. 205, 206 (1988). The reason is that a suspect's freedom of action has not been curtailed to a degree comparable to a formal arrest. *See Berkemer v. McCarty,* 468 U.S. 420, 440, 82 L. Ed. 2d 317, 104 S. Ct. 3138 (1984). Here, it does not matter that Wilkinson was not free to leave. An investigatee is not free to leave during the course of a *Terry* stop. Nor does it matter that Wilkinson was frisked. Frisks are routine during investigative stops involving potential weapons. A frisk does not make a stop comparable to a formal arrest for purposes of *Miranda. See State v. Toro,* 229 N.J. Super. 215, 551 A.2d 170 (1988); *People v. Bennett,* 70 N.Y.2d 891, 524 N.Y.S.2d 378, 519 N.E.2d 289 (1987); *People v. Morales,* 129 A.D.2d 440, 514 N.Y.S.2d 13 (1987). The factors considered significant in *Berkemer* and *Bruder* are all present here. Wilkinson's detention was brief. He was never told that it was not temporary. The officer was alone. The patdown was a simple

procedure at roadside. The officer's question was for the purpose of self–protection. A "very brief, noncoercive, non-deceptive, single question" during the course of an investigative stop does not amount to custodial interrogation. *See State v. Hensler*, 109 Wn.2d 357, 363, 745 P.2d 34 (1987).

Wilkinson was not entitled to *Miranda* warnings when he surrendered the first syringe to the officer. In other words, his act of surrendering the syringe was not the product of compulsion within the meaning of the state or federal constitutional provisions against compulsory self–incrimination. *See State v. Moore*, 79 Wn.2d 51, 57, 483 P.2d 630 (1971) (no compelling justification to expand state constitutional privilege beyond federal counterpart); *see also State v. Franco*, 96 Wn.2d 816, 639 P.2d 1320 (1982) (reaffirming *Moore*). The first syringe gave rise to probable cause to arrest, making the second syringe admissible as the product of a search incident to a valid arrest.

We reverse and remand for further proceedings.

COLEMAN, C.J., and SCHOLFIELD, J., concur.

Review denied at 114 Wn.2d 1015 (1990).